The case this morning for oral argument is 23-2246, Tackett v. Dr. Dauss. Good morning, Mr. Snyderman. Good morning, Your Honors. May it please the Court. My name is Mark Snyderman, and I am counsel for plaintiff-appellant Skyler Tackett. Skyler's father, Raymond Tackett, Jr., had a deadly but curable disease. He asked for the cure but did not receive it, and at the age of 47, he suffered a death that was completely preventable. It is undisputed that the medical standard of care required that he receive the cure. Plaintiff-appellant respectfully asked this Court to reverse the grant of summary judgment to defendant-appellee Dr. Dauss because, when the facts and the inferences rising therefrom are viewed in plaintiff's favor, it was error to conclude that Dr. Dauss was reasonable as a matter of law. A reasonable jury could find Dr. Dauss's actions were unreasonable and that she was deliberately indifferent to Mr. Tackett's serious medical need. Because this is not an official capacity claim but an individual capacity claim, can we drill down a little bit more as to what was presented to the district judge in regards to evidence that Dr. Dauss, in her individual capacity, was deliberately indifferent? Thank you, Your Honor. The evidence that was presented on that question goes, I think, not to the objective prong of serious medical need, which I believe defendants conceded and the Court recognized, but to Dr. Dauss's subjective mindset. And that is she was a defendant in the Stafford matter after summary judgment in the Stafford case, which preceded this one. She was substituted in by dint of her new position. She made representations to that court through counsel that she understood that the policies had been held unconstitutional. And she made a representation to people in the hepatitis C community at the summit in Indianapolis that the policy had been held unconstitutional. Now, this is disputed. Dr. Dauss also states that she didn't know it was unconstitutional. So I think it's a question of fact as to her mindset, but plaintiff has- Let's fast forward a little bit regarding the process once Dr. Dauss is substituted in the Stafford case. It's my understanding from looking at the record that there was a draft policy that the Stafford plaintiffs, the class plaintiffs through counsel, of course, as well as Dr. Dauss through counsel, represented to the Stafford court that this working policy was fair and reasonable. And so is there a misunderstanding in regards to the draft policy that was put before the Stafford in the draft policy that we have in front of us? Yes, Your Honor. The short answer is yes. There were several misunderstandings in the record in this case and probably in Stafford too, because there were several different policies that were sequential that had the same numbers, 3.09, 3.09A draft policy. So the policy that was in effect when Dr. Dauss assumed her position was probably 3.09A. It was March 1, 2019. She came into her position probably a few days later, although that fact is that there's some different start dates suggested. That policy, plaintiff contends, and there's evidence to support the notion, stayed in effect until its successor policy, 3.09A, of February 2, 2020 was in effect. Dr. Dauss testifies that she, along the way at the end of March 2019, that she started a draft policy. And that draft policy absolutely bore many similarities to the agreement in Stafford that the Stafford plaintiffs agreed to and that the court approved in January of 2020. But there's a stipulation made in Stafford when they're requesting that their motion, that the remedy hearing be continued. And so that's in there attached to that stipulation that there has been an agreement is in Exhibit A. And that's what I'm trying to drill down. Is this the same draft policy that we're talking about here? It is essentially, Your Honor, yes. It is the same as the draft policy that Dr. Dauss contends that she put into place from March of 2019 onward. And that Stafford stipulation reflects essentially the same policy. Yes, Your Honor. But it's and on that, just just a word, because all of the policies have some differences and they're important. But it all reminds me of that phrase that a rose by any other name would still smell as sweet without the positive connotation. All of the policies were deficient. All of the policies are below the standard of care. All of the policies are unconstitutional. Mr. Schneiderman, you don't dispute that at the time of Mr. Tackett's unfortunate death, which looks like it could have been prevented here, that he qualified for this treatment under the policy. Is that correct? He qualified under the predecessor policy. Yes, Your Honor. OK, and how could and I don't think there's any dispute. Dr. Dauss was not involved in his medical care and she did not know that he was not receiving the treatment. You agree with that? Agree that that's undisputed. How can she then be deliberately indifferent for her role in a policy that included him, which she had no knowledge that he wasn't getting what he should have been under the policy? Thank you, Your Honor. It's precisely because the policy was discretionary. The previous policy in effect in 2019 and 2018 made such treatment, which was the standard of care since 2017. It was essentially universal treatment with the standard of care, but the policy didn't reflect that. None of the policies reflected that. It was discretionary with the treatment providers. Nurse Myers testifies that she actually recommended him for treatment because she was so concerned about him. That went up to the Wexford Reviewing Committee. Nurse Myers doesn't know what happened at that point. So it's the discretionary nature of the policy that you're challenging? Yes, Your Honor, because it should have been a flat universal policy and had the appropriate... But aren't there some individuals who would fall within required treatment that shouldn't get it for various reasons? Shouldn't that be left up to a treating doctor or nurse? It's a vanishingly small number that's recommended by Dr. Vupalanchi and by the HCV Guidance Council, and everybody should get the treatment except for those with short-life expectancies that cannot be remediated by treating HCV, hepatitis C, or by transplantation or by other directed therapy. By and large, everybody should receive the treatment. And there's no evidence that Mr. Tackett was in this exception pool at all. Let me make sure I understand what you're saying. So the March 2019 working policy that she implements shortly after she comes on board, that you say had the same discretionary policy? Yes, Your Honor. Discretionary quality. And is it your position that no policy would have been sufficient here and met the standard of care unless it was a policy that said all people get treatment, full stop, no exceptions? It's not just my position, which it is, yes. And second, it is the expert evidence in this case. It's undisputed. Dr. Vupalanchi is the only expert to opine on that. There's no medical basis or rationale proffered by defendant for any of the medical policies or for any of the HCV policies. Not even for the exceptions that you just listed and reminded us of, right? Except for those exceptions. Those exceptions allow the providers to determine, the doctors and the nurses, to determine which people don't fit the HCV guidance panel definition, which is short life expectancies, basically, that cannot be remediated by this treatment. But there's no evidence that that was the case for Mr. Tackett. You're in your rebuttal. If you want to save a little bit of time. May I? Yes. Thank you. Ms. Rick, good morning. Good morning. May it please the court. In the month after Dr. Doss became the chief medical officer for the Indiana Department of Correction, she amended the department's hepatitis C policy to expand access to DA treatment. Under that policy, it was recommended that offenders like Mr. Tackett receive DAA treatment. Dr. Doss was not responsible for Mr. Tackett's medical care, and she played no role in his treatment decisions. Can you respond to Mr. Snyderman's point that even though she revised the policy, it remained discretionary? So it was just a recommendation, and indeed, that's what happened to Tackett. Nurse Myers looked at him, saw some cirrhosis setting in, and recommended that he get treatment. But that would still be below the standard of care because the panel recommends everybody get this medicine. And there's no other expert testimony contradicting Dr. Vu Villepunchy, her testimony about this. Well, I have two responses. First, the standard of care is more a negligence term, and here we're talking about deliberate indifference and whether Dr. Doss- I think you know that I'm referring to the panel, the panel's findings. So this is a factual issue in the case. It's not a misconception about what the standard is. Correct. But I do want to point out that the policy that Dr. Doss implemented, it did make some changes from the March. So there was the March 2019 policy and then the April 2019 working policy. And the April 2019- We're using different terms, but I want to make sure we're talking about the same policy. And so I noticed this in the briefing that we're kind of talking past each other. So you're using the word working policy, and Mr. Steinem is using the word draft. So which one are we referring to? They're both the same, and I can use the term draft if that would be easier for you. So we're talking about the draft policy that's attached to Exhibit A in Stafford and Dr. 63 here. That's correct. And there also was a March 2019 policy. So the draft policy was actually from April. I just want to make sure you guys are clear on that. So the April 2019 draft policy was actually substantially different from the March 2019 policy because it recommended treatment for offenders in Groups 1 and 2 and then recommended consideration for treatment in Group 3. And this allowed the medical providers to make an individualized determination as to whether an offender should receive the treatment. But how is this not then a substantial disregard of the harm? The record was clear by this point that if you don't receive this medication, the likelihood that this would turn into liver cancer or death was imminent. Regardless of where you were, if this disease was not treated, that this would be the end result. Well, it wasn't deliberate indifference because it allowed the medical providers to treat the patients with DIAs, whereas the court in Stafford found that the policy at the time didn't really allow them to make that individualized determination as to whether an offender should receive treatment. And I think here the fact that Nurse Myers recommended Mr. Tackett for treatment shows that he was eligible under the policies that were in place at the time. Why was there the need to still prioritize? I'm not exactly sure why there were the three treatment groups, but the first and second groups, the policy specifically recommended the DIA treatment. And then the third group, it recommended consideration for treatment. If we're defending Dr. Dowse and her professional judgment, she made the decision to continue to prioritize a life-saving treatment. And so for counsel to represent that I'm still not able at oral argument to articulate why the prioritization was concerning. Well, Your Honor, I would push back that it was really a prioritization. Yes, there are the three groups, but like I said, it is different from the Federal Bureau of Prisons policy because it did specifically recommend treatment. Let me try to rephrase the question since prioritization is a distractor. Why was there a need to still have groups? Group one gets it, group two could, group three doesn't. Why was there a need for those different groups? I'm not sure that there specifically was a need, but the fact that she had the three groups doesn't show deliberate indifference. Just because her policy wasn't specifically, as Mr. Tackett would like it to say, doesn't compel treatment for all offenders. Well, we're at the summary judgment stage, right? This is the put-up or shut-up phase of the case. And if the district court says we don't want thousands of prisoners charging the gate, so the groups make sense. And so I'm asking from a medical standpoint or professional judgment of Dr. Dowse, why was it necessary? Well, I think the groups make sense because she is ensuring that the sickest offenders, the ones that are at the greatest risk of dying for the disease first, get treatment. And this policy she implemented while Stafford was ongoing. So we know that by the time the Stafford settlement is approved by the court that there is a timeline for when all the treatment has to be provided to all offenders with hepatitis C. So I think that it was reasonable for her to ensure that the sickest offenders were getting the treatment first, and Mr. Tackett was included in that category. There's evidence that he had cirrhosis. His APRI scores made him eligible under Group 2. Cirrhosis made him eligible under Group 1. And so here the evidence really shows that it wasn't Dr. Dowse that led to him not receiving the treatment. Why didn't he get the treatment after Nurse Myers put the request in? That's not clear from the record, Your Honor. Nurse Myers put the request into Wexford's regional office, and there's no evidence in the record why they didn't approve him for treatment. That request was put in place at the end of July, and Mr. Tackett died at the end of November. So really unsure as to why he didn't get the treatment. Looking at the Atkins case in the Sixth Circuit, the Sixth Circuit held that rationing out this treatment is not, per se, unconstitutional. What reasonable steps did Dr. Dowse take in this case? Well, Your Honor, as I said, the draft policy was substantially different from the policy in place that was issued in Stafford, and she made it more clear to the medical providers that DAA treatment was the recommended treatment, whereas the prior policy, the Federal Bureau of Prisons policy, seemed to imply that only offenders in Treatment Group 1 should be prioritized for the DAA treatment, whereas Dr. Dowse's draft policy made it clear that all offenders with hepatitis C should be recommended for treatment. So the only reasonable step that I'm hearing is that there was a draft policy in being drafted. We were discussing it, writing about it. Well, Your Honor, it was not only just a draft. It was unofficially implemented. What does unofficially implemented mean versus draft? It was the policy— Versus we were writing something out that was going to be implemented. It was the policy that the medical providers were supposed to be using, and actually, Nurse Myers— Then what support do we have that this draft, unofficial draft, unofficial working document was one that was implemented? Firstly, Dr. Dowse testified that it was supposed to be the policy that was in place, the medical providers were using. But also, Nurse Myers testified that it appeared to be the policy that they were using in 2019. Sounds like your answer to Judge Pryor's question is yes, that is the reasonable step that she's hearing, this draft policy. So then why is that not a jury question, if that's all the State can point to right now? It's not a jury question because there's no evidence here—Mr. Tackett didn't present any evidence that Dr. Dowse was deliberately indifferent— where she took steps to expand access. And actually, in the record, if you look, there's a chart. It shows that while this draft policy was implemented, there was a 128% increase in the number of offenders receiving the DIA treatment. And then the number continued to rise in 2020 and beyond. So Mr. Tackett just hasn't presented any evidence that Dr. Dowse was specifically deliberately indifferent to Mr. Tackett. So this is not a class action where we're looking at all offenders with hepatitis C. Why couldn't a reasonable jury conclude that Dr. Dowse was deliberately indifferent by continuing to rationalize out DIA treatment? Again, I would push back on that she was continuing to ration the treatment. Her policy made it clear that the treatment was recommended, and it's reasonable for her as a doctor to rely on an offender's medical providers to recommend treatment if they see fit, or to provide the treatment if they see fit. Thank you. If there are no further questions, Dr. Dowse asks that the court affirm. Thank you, Ms. Ricker. Mr. Snyderman, Rip Edel. May I speak to the court? May I respond to some of the court's questions that came up in discussion with counsel? Thank you. The 128% is a number that came up in the summary judgment arguments on the papers. It's a number that the state relies on, but percentages can be misleading. It might be evidence of reasonableness. It might not. 100% of a small number is necessarily a small number. Would Mr. Tackett have received DEA treatment under Dr. Dowse's policy? Would he have? Uh-huh. There was no requirement, no. It was purely discretionary. There were different groups. It was prioritized. It was rationed. But there's no, unlike the Stafford Agreement, which went into effect in February 2020, there was no requirement of any treatment by any date. That's what gave the Stafford Agreement teeth, is that these groups have to be treated by certain dates. But, you know, even that Stafford Agreement has different groups being treated by different dates. Respectfully, Your Honor, the Stafford Agreement does. Absolutely. But that doesn't go into effect until February 2020, well after Mr. Tackett died. And even the Stafford Agreement— I understand that. Thank you. I feel like I'm not responding to your question. I'm sorry. What I'm saying is how that might—oh. It would have made a difference for Mr. Tackett had the Stafford Agreement been reached earlier. Yes. It would have. It would have saved his life. And during 2019, we were negotiating, and that's what the ultimate position was, but it came too late. It came too late. Did Mr. Tackett settle with—I know that they were dismissed from the case, Meyer and Wexford. Did he settle with them? He did, Your Honor, with the three doctors who say that they were bound. And this goes—I'm sorry. I'm out of time. But you may answer Judge Jackson-Akumi's question. He did, Your Honor. The court has no further questions. Thank you very much. Thank you. Thanks to both counsel. The court will take the case under advisement.